## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:                                                    **Chapter 11**

**TELTRONICS, INC.,**                                      **Case No. 8:11-bk-12150-KRM**

      Debtor.

_____/                          *Emergency Relief Requested*

**DEBTOR'S EMERGENCY MOTION FOR AUTHORITY TO (A) OBTAIN POSTPETITION FINANCING FROM WELLS FARGO CAPITAL FINANCE, INC. AND GRANT SENIOR LIENS, SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS AND ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 364(c) AND (d) AND F.R.B.P. 4001, (B) USE CASH COLLATERAL, AND (C) MAINTAIN ITS EXISTING CASH MANAGEMENT SYSTEM**

---

**A hearing on this Motion will be held on Wednesday, June 29, 2011, at 1:30 p.m., in Courtroom 9B, Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, Tampa, Florida, before the Honorable K. Rodney May, Bankruptcy Judge.**

---

### STATEMENT OF RELIEF REQUESTED

The Debtor seeks authority to borrow money, pursuant to a revolving credit facility with Wells Fargo Capital Finance, Inc., in order to fund operating expenses and costs of administration in this Chapter 11 case in accordance with the term sheet and proposed budget attached hereto. The liens proposed to be granted would be senior liens on all property of the Debtor, except as otherwise provided in this Motion. This Motion seeks to have the liens granted pursuant to any financing approved by this Court to be deemed perfected without the need for any further filings. The principal terms of the revolving credit facility are set forth in Paragraph 24 of this Motion.

### Introduction

      Teltronics, Inc., as debtor and debtor in possession (the "**Debtor**"), by and through its

undersigned counsel, hereby files its Emergency Motion for Authority to (A) Obtain Postpetition

Financing from Wells Fargo Capital Finance, Inc. and Grant Senior Liens, Superpriority

Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and

F.R.B.P. 4001, (B) Use Cash Collateral, and (C) Maintain its Existing Cash Management System (the "**Motion**"), and respectfully requests that this Court enter an order, inter alia:

(A)    Authorizing the Debtor to borrow on a secured basis from Wells Fargo Capital Finance, Inc. (the "**DIP Lender**") the principal amount of up to $2,500,000 (the "**DIP Facility**"), substantially in accordance with the terms of this Motion and the Term Sheet attached hereto as Exhibit A (the "**Term Sheet**");[1]

(B)    Authorizing the Debtor to execute an amendment (the "**DIP Loan Agreement**") to the Prepetition Credit Agreement (as defined below) with Wells Fargo Capital Finance, Inc. and such other documents, instruments and agreements required by the DIP Facility, which shall be consistent with the provisions of this Motion and the Term Sheet (collectively, the "**DIP Loan Documents**"), and authorizing the Debtor to perform all such other acts as may be required in connection with the DIP Loan Documents;[2]

(C)    Authorizing the Debtor, under Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, to obtain postpetition financing and incur postpetition indebtedness under the DIP Facility, which financing and indebtedness due and owing by the Debtor to the DIP Lender shall be secured, subject to the Carve-Out (as defined below), by (i) liens on and security interests in all assets and property of the Debtor, which liens and security interests shall, pursuant to Sections 364(c)(2) and  364(d)(1) of the Bankruptcy Code, be senior to all prepetition and postpetition liens or other interests encumbering assets and property of the Debtor including the liens and security

---

[1]    At the initial hearing on this Motion, the Debtor will seek authority to borrow such amount as is necessary to avoid immediate and irreparable harm on an interim basis pending entry of a final order of the Court granting this Motion.

[2]    At the present time, the Debtor anticipates that the DIP Lender will only require the Debtor to execute the DIP Loan Agreement at the closing of the DIP Facility, which DIP Loan Agreement  will contain the principal business terms of the DIP Facility as approved by this Court.

interests of the Prepetition Lender (as defined below), and (ii) liens on and security interests in all assets and property of the Debtor that are not encumbered by liens in favor of the Prepetition Lender, which liens and security interests shall, pursuant to Section 364(c)(3) of the Bankruptcy Code, be senior to all prepetition and postpetition liens or other interests encumbering property of the Debtor except for any junior permitted liens as provided in the Term Sheet;

(D)     Authorizing the Debtor to grant to the DIP Lender, in accordance with Section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim having priority over any and all administrative expenses of and priority claims against the Debtor, subject only to the Carve-Out;

(E)     Authorizing the Debtor to use Cash Collateral (as defined below) to the extent set forth herein;

(F)     Authorizing the Debtor to maintain its existing cash management system with Wells Fargo Bank, N.A.;

(G)     Modifying and, to the extent necessary, lifting the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to permit the DIP Lender and the Debtor to implement the terms of this Motion; and

(H)     Granting the Debtor such other and further relief as the Court deems necessary, appropriate, equitable, proper, and consistent with the terms of this Motion.

### Jurisdiction

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this district pursuant to 28 U.S.C. § 1408.  The statutory predicates for the relief sought

herein include Sections 105, 361, 362, 363, 364 and 545 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## Background

2.      On June 27, 2011 (the "**Petition Date**"), the Debtor filed with this Court its Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code.

3.      The Debtor continues to operate its business and manage its property as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No previous application for the relief sought herein has been made by the Debtor to this Court or any other court.

5.      No trustee or examiner has been appointed in this case, and no official committees have yet been appointed pursuant to Section 1102 of the Bankruptcy Code.

6.      The Debtor, a publicly-traded Delaware corporation, designs, installs, develops, manufactures and markets electronic hardware and application software products, and engages in electronic manufacturing services primarily in the telecommunications industry.  The Debtor provides telecommunications equipment, converged communications platforms and software solutions to over 20,000 customers worldwide.  The Debtor's primary focus is the design, development, manufacturing, marketing and installation of PBX switching, converged communications applications and infrastructure monitoring solutions.  The Debtor also provides electronic manufacturing services for companies in the military, security, industrial, medical and telecommunications sectors.

7.      The Debtor's corporate headquarters and manufacturing facility is located at 2511 Corporate Way in Palmetto, Florida, and is comprised of 21,250 square feet of office space and

4

30,000 square feet of manufacturing space.  The Debtor also has office locations in the States of New York, California, and Georgia, primarily to service customers in those locations.

8.  The Debtor has three (3) wholly-owned subsidiaries, Teltronics Limited, 36371 Yukon Inc., and TTG Acquisition Corp.

9.  For the fiscal year ended December 31, 2010, the Debtor's consolidated statement of operations reflected total net sales of approximately $26.2 million, total operating expenses of approximately $10.9 million, and a net operating loss of approximately $5.0 million.  As of December 31, 2010, the Debtor's consolidated balance sheet reflected total assets of approximately $9.1 million and total liabilities of approximately $19.8 million.

### Prepetition Secured Indebtedness and Liens

10.  On May 31, 2007, the Debtor, as borrower, and Wells Fargo Foothill, Inc. (n/k/a Wells Fargo Capital Finance, Inc.), as lender (the "**Prepetition Lender**"), entered into a Credit Agreement (as amended from time to time, the "**Prepetition Credit Agreement**").  The Prepetition Credit Agreement provided for a revolving loan facility (the "**Revolving Loan**") and a term loan facility (the "**Term Loan**") from the Prepetition Lender to the Debtor.  As of the Petition Date, the outstanding balances under the Revolving Loan and the Term Loan were approximately $1.8 million and $1.1 million, respectively (collectively, the "**Prepetition Indebtedness**").

11.  The obligations of the Debtor under the Prepetition Credit Agreement are secured by liens and security interests (the "**Prepetition Liens**") on substantially all of the tangible and intangible personal property of the Debtor, including the Debtor's accounts receivable and inventory (collectively, the "**Prepetition Collateral**"), pursuant to a Security Agreement and other agreements and documents executed by the Debtor in favor of the Prepetition Lender prior to the Petition Date (collectively, the "**Prepetition Security Agreements**").

5

12.     Copies of the Prepetition Credit Agreement and the Prepetition Security Agreements are voluminous and have not been filed with this Motion, but are available upon written request to undersigned counsel for the Debtor or counsel to the Prepetition Lender.  The Prepetition Credit Agreement, the Prepetition Security Agreements, and all other documents executed in connection therewith shall hereinafter be referred to collectively as the "**Prepetition Loan Documents**."

**Use of Cash Collateral**

13.     On and following the Petition Date, absent the DIP Facility, the Debtor's business operations will need to be funded largely by the collection of receipts generated from the Debtor's operations which may constitute cash collateral as defined in 11 U.S.C. § 363(a) ("**Cash Collateral**").  Pursuant to 11 U.S.C. §363(c)(2), on the Petition Date, the Debtor was prohibited from using Cash Collateral without the consent of the Prepetition Lender or an order of this Court.

14.     Pursuant to this Motion, the Debtor also seeks entry of an order authorizing the use of Cash Collateral generally in accordance with the Budget (as defined below) and for purposes which include the following:

    a.     care, maintenance and preservation of the Debtor's assets;

    b.     payment of necessary payroll, rent, suppliers, utilities, and other business expenses;

    c.     other payments necessary to sustain continued business operations; and

    d.     costs of administration in this Chapter 11 case.

15.     In exchange for the Debtor's ability to use Cash Collateral in the operation of its business, as adequate protection, the Debtor proposes to grant to the Prepetition Lender replacement liens equal in extent, validity, and priority as the liens the Prepetition Lender held as of the Petition

6

Date; provided, however, that in all events, such replacement liens shall be junior and subordinate to the liens granted to the DIP Lender in connection with the DIP Facility.

## Cash Management System

16.    In the day-to-day operation of its business, the Debtor utilizes a centralized cash management system.  The cash management system provides a well-established mechanism for the collection, concentration, management, transfer and disbursement of funds generated through the Debtor's operations and to accurately record such collections, transfers, and disbursements as they are made.  The principal components of this cash management system are (i) cash collection in a lockbox account, (ii) transfer of collections/receipts to a concentration account, and (iii) transfer of advances by the Prepetition Lender to the Debtor's operating and disbursement accounts.  The cash management system was implemented in connection with the Prepetition Credit Agreement with the Prepetition Lender.

17.    Payments made by the Debtor's customers for goods provided and services rendered by the Debtor are all sent to, and deposited on a daily basis into, a lockbox account maintained by Wells Fargo Bank, N.A. (titled Teltronics Lockbox Account, Account Number xxxx7437) (the "**Lockbox Account**").  The cash receipts collected in the Lockbox Account are then sent on a daily basis to a blocked concentration account maintained by Wells Fargo Bank, N.A. (titled Teltronics Advance Account, Account Number xxxx4127) (the "**Concentration Account**").  The Debtor makes disbursements for payroll, contributions to employees' 401(k) and other benefit plans, and payment of accounts payable, operating expenses and various other expenses out of an operating account and disbursement accounts maintained at Wells Fargo Bank, N.A. (collectively, the "**Disbursement Accounts**").  Certain of the Disbursement Accounts are zero-balance accounts that

are funded solely through transfers from the Concentration Account as checks are presented for payment.

18.     Borrowing requests made under the DIP Facility will be funded from the Concentration Account to the Disbursement Accounts.  For the purposes of this Motion, the Debtor requests that it be authorized (i) to continue to utilize its existing cash management system, as described in this Motion, with the Debtor giving prior written notice to the U.S. Trustee with respect to any proposed changes therein; (ii) to continue to use its existing bank accounts in the name and with the account numbers existing immediately before the commencement of this Chapter 11 case, deposit funds in and withdraw funds from such accounts by all usual means, including without limitation checks, wire transfers, electronic funds transfers, and other debits, and treat its prepetition bank accounts for all purposes as debtor in possession accounts, provided, however, that the signature card on any accounts shall reflect that they are now debtor in possession accounts; (iii) to maintain and continue to use the credit card processing system existing immediately prior to the Petition Date, which system is connected to its prepetition bank accounts; and (iv) to continue to use its existing business forms in connection therewith.

19.     The Debtor further requests that (i) any existing deposit agreements between the Debtor and its existing depository and disbursement banks (collectively, the "**Banks**") shall continue to govern the postpetition cash management relationship between the Debtor and the Banks, and that all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect; and (ii) the Debtor and the Banks may, without further order of this Court, agree to and implement changes to the cash management systems and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts.  In addition, the Debtor requests that each of the Banks be authorized to debit the

Debtor's accounts in the ordinary course of business without the need for further order of this Court for: (i) all checks drawn on the Debtor's accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date; (ii) all checks or other items deposited in one of the Debtor's accounts with such Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtor was responsible for such items prior to the Petition Date; and (iii) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the cash management system.

20.      The Debtor's cash management system or a variation thereof has been used for a number of years and constitutes an ordinary course essential business practice. The cash management system, as described above, provides significant benefits to the Debtor including, *inter alia*, the ability to (i) effectively control corporate funds, (ii) ensure the maximum availability of funds when necessary, and (iii) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information. Based upon the foregoing, maintenance of the existing cash management system is in the best interests of the Debtor, its creditors, and other parties in interest and is necessary for the effective reorganization of the Debtor's operations.

21.      Courts have consistently recognized the risk of harm to the bankruptcy estate if a debtor is unable to continue managing its cash in a manner that avoids interruption of its operations. In fact, bankruptcy courts have routinely granted Chapter 11 debtors the authority to continue using their existing cash management systems and treat requests for such authority as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr.S.D. Ohio 1987). This is particularly

9

true where, as here, a Chapter 11 case involves a debtor with affiliates and with complex financial affairs. See, *e.g., In re Charter Co.*, 778 F.2d 617 (11th Cir. (Fla.) 1985).

## Terms of the DIP Facility

22.     The DIP Lender is Wells Fargo Capital Finance, Inc., a California corporation. Neither the DIP Lender nor any of its officers, directors, managers or members is an affiliate of, or otherwise connected with, the Debtor.

23.     Prior to the filing of this Chapter 11 case, the Debtor attempted to locate new financing as well as postpetition financing through normal commercial sources which typically provide such financing, but discovered that this capital market, similar to the overall debt and equity markets in the United States and worldwide, is experiencing greatly diminished activity levels and severely limited liquidity, making the Debtor's ability to access such funding through traditional sources virtually impossible. Thus, the Debtor has chosen to obtain debtor in possession financing from its existing senior secured lender.

24.     The principal terms of the DIP Facility, as set forth in the Term Sheet, are as follows:[3]

> (a)     <u>Amount of DIP Facility</u>.  The DIP Facility will be a revolving line of credit in the amount of $2,500,000 with a $550,000 sublimit for advances against inventory.  The maximum amount available under the DIP Facility is subject to the Borrowing Base.
>
> (b)     <u>Available Amount</u>.  Advances under the DIP Facility shall not exceed the lowest of:
> 1.       $2,500,000, or
> 2.       The amount calculated under the Borrowing Base, or
> 3.       An amount equal to: (i) 110% of the amounts of all projected disbursements for each week set forth in the budget attached to the Term Sheet as <u>Annex A</u> (the "**Budget**") minus (ii) the aggregate amount of

---

[3] Unless otherwise defined herein, capitalized terms used in this Paragraph 24 shall have the meaning ascribed thereto in the Term Sheet.

advances actually made under the DIP Facility by the Debtor from the Closing Date (as defined below) through such date of determination (prior to giving effect to any requested loan not yet made) on a weekly basis. The Budget shall not be modified or otherwise amended without the consent of the DIP Lender.

(c)     Borrowing Base. "Borrowing Base" means, as of any date of determination, the result of:

1.     the lesser of:
   (a)     85% of the amount of prepetition and postpetition Eligible Accounts, less the amount, if any, of the Dilution Reserve, and
   (b)     an amount equal to Borrower's Collections with respect to Accounts for the immediately preceding 55 day period, plus

2.     the lower of:
   (a)     $550,000, and
   (b)     12% of the value of prepetition and postpetition Eligible Inventory valued at cost, minus

3.     the sum of (a) the Bank Product Reserve, (b) a reserve in the amount of the claim of certain "carve out" expenses relating to fees and costs incurred by professionals retained by the Debtor or another party pursuant to Section 328 of the Bankruptcy Code, not to exceed an aggregate sum of $100,000, and (c) the aggregate amount of any other reserves established by the DIP Lender under the DIP Loan Agreement, minus

4.     the outstanding balance of all advances under the Prepetition Credit Agreement, minus

5.     other standard deductions from the Borrowing Base substantially the same as in the Prepetition Credit Agreement.

Eligibility as acceptable collateral on which to advance and the advance rates will be solely determined by the DIP Lender.

(d)     Use of Proceeds. Proceeds of all advances under the DIP Facility may be used to fund general corporate and working capital requirements of the Debtor (including fees and expenses) and identified as projected disbursements in the Budget. No portion of the DIP Facility may be used to commence or prosecute any action or objection with respect to the Prepetition Obligations or the liens on or security interests in favor of the Prepetition Lender in the Prepetition Collateral.

(e)     Application of Proceeds. The proceeds of all Prepetition Collateral shall be applied first to repay outstanding Prepetition Obligations until paid in full, and thereafter to repay outstanding obligations under the DIP Facility (the "**DIP Facility Obligations**"). The proceeds of all Postpetition Collateral (as defined below) shall be applied first to repay outstanding DIP Facility

Obligations until paid in full, and thereafter to repay outstanding Prepetition Obligations but only to the extent of any diminution in value following commencement of this Chapter 11 case.  In the event any proceeds cannot conclusively be identified by the Debtor as Prepetition Collateral or Postpetition Collateral, the Prepetition Lender and the DIP Lender shall be entitled to treat such proceeds as Prepetition Collateral.

(f)     Closing Date.  The closing (the "**Closing**") of the DIP Facility shall occur on the date on which an interim order approving the DIP Facility and the DIP Loan Documents acceptable to the DIP Lender (the "**Interim Order**") is entered by the Court, and fulfillment of all of the other Conditions Precedent and Conditions Subsequent set forth below to the satisfaction of the DIP Lender and its counsel (the "**Closing Date**").  At the Closing, the Debtor will execute and deliver the DIP Loan Documents to the DIP Lender.

(g)     Termination Date.  The commitment of the DIP Lender will terminate and all amounts owing under the DIP Facility will be due and payable, on the earliest to occur of: (i) September 30, 2011, (ii) the effective date of a plan of reorganization in form and substance acceptable to the DIP Lender, (iii) the occurrence of an Event of Default (as defined below) under the DIP Loan Agreement or the DIP Loan Documents and a determination by the DIP Lender to terminate its commitment (such date, the "**Termination Date**"), or (iv) the closing of a sale that satisfies the Obligations (as defined below) in full in cash.

(h)     Collateral.  All loans and advances under the DIP Facility shall be secured by a security interest in all accounts, chattel paper, documents, deposit accounts, equipment, general intangibles, instruments, intellectual property, inventory, investment property, letter-of-credit rights, real estate, and all other business assets, including without limitation, all Prepetition Collateral, excluding, however, all rights, actions and recoveries arising under Chapter 5 of the Bankruptcy Code including avoidance actions (the "**Avoiding Power Causes of Action**").  All collateral (other than Prepetition Collateral) is herein referred to as "**Postpetition Collateral**."

(i)     Secured Priority.  All claims of the DIP Lender will be senior priority pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, junior only to (i) certain liens and interests of certain senior, purchase money security interests and lessor interests of record as perfected by UCC-1 Financing Statements in existence at the time of commencement of this case, and not otherwise avoided, (ii) valid, enforceable and perfected liens that are capitalized leases, purchase money security interests or mechanics' liens in existence at the time of commencement of this case as identified and scheduled, (iii) valid and enforceable liens that are capitalized leases, purchase money security interests or mechanics' liens in existence at the time of such commencement that are perfected subsequent to such commencement

12

as permitted by Section 546(b) of the Bankruptcy Code as identified and scheduled, (iv) the claim of certain "carve out" expenses relating to fees and costs incurred by professionals retained by the Debtor or another party pursuant to Section 328 of the Bankruptcy Code, not to exceed an aggregate sum of $100,000 (the "**Carve-Out**"), and (v) the payment of certain fees owed to certain governmental agencies and the Court pursuant to 28 U.S.C. § 1930.

(j)     Unsecured Priority.  The claims of the DIP Lender will have administrative unsecured claim priority pursuant to Sections 364(b) and 364(c)(1) of the Bankruptcy Code, excluding, however, Avoiding Power Causes of Action.

(k)     Adequate Protection/Replacement Liens.  Adequate protection shall consist of (i) payments to the DIP Lender of proceeds of Postpetition Collateral consistent with the DIP Facility, and (ii) replacement liens in favor of the Prepetition Lender, in all Prepetition Collateral and Postpetition Collateral, of the same extent, validity and priority as the liens in the Prepetition Collateral in favor of the Prepetition Lender, to the extent of any diminution in value. The Debtor shall continue to make all required payments due under the Prepetition Credit Agreement on all Prepetition Obligations, as and when due, including without limitation, all payments of interest due on the Term Loan.

(l)     Interest Rate.  The DIP Facility will bear interest in an amount equal to the Base Rate plus 3.75% per annum floating, with a minimum interest rate of six percent (6%), payable monthly in arrears calculated on the basis of actual days elapsed in a year of 360 days.  Default rate of interest may be up to two percent (2%) higher than the rate otherwise payable.

(m)    Closing and Loan Costs and Expenses.  A closing fee of $50,000 (the "**Closing Fee**") shall be fully earned upon entry of the Interim Order and payable upon the Termination Date.  A fee of 0.375% per annum on the unused portion of the DIP Facility will be payable monthly on terms substantially the same as in the Prepetition Credit Agreement.  All out-of-pocket expenses incurred to provide the DIP Facility, including without limitation reasonable legal fees and expenses, closing costs, appraisal fees, UCC search and recording fees, costs for individual and corporate credit reports, surveys, real estate title searches, recording fees, environmental assessment fees, physical inspection fees, fees to initiate electronic reporting and collateral examination costs incurred by the DIP Lender in connection with the transactions contemplated by the Term Sheet, are to be paid by the Debtor whether or not the DIP Facility is funded. This obligation will survive the expiration or termination of any approval.

(n)     Conditions Precedent.  The Closing of the DIP Facility is subject to certain conditions precedent as more fully described in the Term Sheet, including but

not limited to the following: (i) the Closing Date must occur no later than July 5, 2011, (ii) the Court shall have entered the Interim Order within seven (7) days after the commencement of this Chapter 11 case consistent with the terms of the Term Sheet and such other terms as required by the DIP Lender, (iii) the Debtor shall retain a chief restructuring officer (the "**CRO**"), whose identity, terms of engagement and scope of duties shall be acceptable to the DIP Lender, and who shall be exclusively responsible for overseeing and managing financial matters of the Debtor, including authorizing disbursements, preparing, reviewing and validating financial reporting and borrowing base certificates, and monitoring the Debtor's income, expenses, financing and use of cash collateral, (iv) all documentation relating to the DIP Facility, in form and substance satisfactory to the DIP Lender and its counsel, creating and granting a first priority lien on the Collateral as outlined herein shall have been executed and delivered, (v) all fees and expenses (including, without limitation, reasonable fees and expenses of counsel) required to be paid to the DIP Lender on or before the Closing Date shall have been paid; provided, however, accrued and unpaid prepetition amendment fees and the Closing Fee shall accrue and be paid on the Termination Date, and (vi) the DIP Lender shall have a valid and perfected first priority lien on and security interest in the Collateral, all filings, recordations and searches (to the extent necessary or desirable by the DIP Lender) in connection with such liens and security interests shall have been effectuated by order of the Court and/or otherwise, and all filing and recording fees and taxes, if any, shall have been duly paid.

(o)    <u>Conditions Subsequent</u>.  The Closing of the DIP Facility is subject to certain conditions subsequent as more fully described in the Term Sheet, including but not limited to the following: (i) the Court shall have entered a final order approving the DIP Facility (the "**Final Order**"), on terms and conditions acceptable to the DIP Lender in its sole and absolute discretion, within thirty (30) days after the commencement of this case, (ii) the Debtor shall engage, not later than thirty (30) days after the Closing Date, an investment banker (the "**Investment Banker**") to assist the Debtor with (A) the refinancing of the Obligations, (B) a sale of all or a portion of the assets (other than in the ordinary course) of the Debtor that will satisfy the Obligations, or (C) a recapitalization of the Debtor in an amount that will satisfy the Obligations (each, a "**Transaction**"), and (iii) not later than seventy-five (75) days following the Closing Date, the Investment Banker shall have (A) prepared and provided to the DIP Lender an information memorandum about the Debtor to be used in connection with soliciting offers for a Transaction, and (B) provided evidence to the DIP Lender that such memorandum has been distributed to potential lenders, investors and/or purchasers.

(p)    <u>Other Conditions</u>.  The DIP Facility is subject to the following additional conditions: (i) the Debtor shall realize gross revenue not less than the

14

projected revenue, and shall not incur or pay expenses greater than 110% of the amounts of all projected expenses, in the aggregate per line item and for each weekly period (which amounts may be increased upon the DIP Lender's prior written consent), as set forth in the Budget, in form and substance acceptable to the DIP Lender; (ii) no objection to the Prepetition Obligations or the liens securing the Prepetition Obligations may be brought after ninety (90) days from the date of selection of counsel for an unsecured creditors committee or, if no unsecured creditors committee is appointed, one hundred twenty (120) days from the commencement of this Chapter 11 case; (iii) in the Final Order, the Debtor shall waive any right to seek a surcharge of the DIP Lender's collateral under Section 506(c) of the Bankruptcy Code upon satisfaction in full of the Obligations; (iv) in the Final Order, the DIP Lender shall be entitled to seek relief from stay upon shortened notice with respect to any act to enforce rights or remedies with respect to the Collateral following default under the DIP Facility; (v) the Debtor irrevocably waives any rights that it may have to seek authority (A) to obtain postpetition loans or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code secured by the Collateral other than from the DIP Lender unless such authority results in the obligations outstanding under the DIP Facility and the Prepetition Obligations (collectively, the "**Obligations**") being satisfied in full, and (B) to use Cash Collateral after an event of a default under the DIP Facility, except for purposes of completing a wind down pursuant to a wind down budget and terms acceptable to the DIP Lender.

(q)     Events of Default.  Each of the following shall constitute an event of default (an "**Event of Default**") under the DIP Facility: (i) dismissal of this Chapter 11 case, (ii) appointment of a Chapter 11 trustee or a responsible officer or examiner with enlarged powers, (iii) entry of an order granting relief from the automatic stay to permit exercise of rights on behalf of any party with respect to a significant asset or assets of the Debtor, (iv) entry of an order granting, or filing by the Debtor of a motion seeking the granting of, any priority claim that is senior or *pari passu* with the priority of claims of the DIP Lender, (v) entry of an order amending, supplementing, modifying, reversing, or vacating, or filing by the Debtor of a motion seeking the amendment, supplement, modification, reversing, or vacating of, any DIP Facility order, (vi) cessation of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects, or (vii) the termination or discharge of the CRO, and he or she is not promptly replaced with a new CRO reasonably acceptable to the DIP Lender.

(r)     Prepayment.  The DIP Facility may be prepaid, in whole or in part, at any time at the option of the Debtor, without penalty or premium.

15

(s)     Collateral Account and Lockbox.  All of the Debtor's receipts shall be directly deposited to a separate collateral account (via the use of a lockbox) at Wells Fargo Bank, N.A.  After allowing one (1) day for collection of receipts by the depository institution, deposited amounts will be applied to the DIP Facility Obligations or the Prepetition Obligations, as set forth above.  For interest calculation purposes, deposited amounts will be applied within one (1) business day of receipt by Wells Fargo Bank, N.A. in its general account, but the amount of principal paid shall continue to accrue interest at the applicable interest rate from the calendar day of receipt by Wells Fargo Bank, N.A. until one (1) business day after receipt by Wells Fargo Bank, N.A. Standard money transfer and/or wire fees will apply. Notwithstanding the forgoing, upon Wells Fargo Bank, N.A.'s prior consent at Wells Fargo Bank, N.A.'s discretion, the Debtor may retain and use certain deposits and prepayments by customers paid to the Debtor for the purchase of raw materials to the extent that such prepayments are held by the Debtor pursuant to an arrangement acceptable to Wells Fargo Bank, N.A. pursuant to which the prepayment funds will only be released upon Wells Fargo Bank, N.A.'s written consent.

25.     The description of the Term Sheet contained above in this Motion is intended as a summary only and is qualified in its entirety by reference to the Term Sheet itself, and to the extent there is any inconsistency between the language of the Term Sheet and the description thereof set forth in this Motion, the Term Sheet shall control any such inconsistency.  Each creditor of the Debtor and party in interest should read, consider and carefully analyze the terms and provisions of the Term Sheet.

## **Relief Requested and Ground for Relief**

26.     The Debtor hereby requests authority, pursuant to Sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code and Bankruptcy Rules 4001 and 9014, to obtain postpetition loans, advances and other financial accommodations from the DIP Lender in an amount of up to $2,500,000, secured by a security interest in and lien on all assets and properties of the Debtor which will be senior to any existing prepetition and postpetition liens, including any and all liens held by the Prepetition Lender, except as otherwise provided in this Motion. The DIP Lender

shall not be granted a lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, or 553(b) of the Bankruptcy Code.

27.     The liens to be granted in favor of the DIP Lender shall prime the liens granted in favor of the Prepetition Lender as to the Debtor's assets.  Except for the priming of the liens held by the Prepetition Lender, the Prepetition Lender shall retain all rights, defenses and claims under the Prepetition Loan Documents and the Debtor shall reserve, and is not waiving, any of its rights with respect to the claims and liens of the Prepetition Lender.

28.     Notwithstanding anything to the contrary contained in this Motion or in any documents executed by any party in connection with the DIP Facility, (i) no determination will be made as to the extent, validity, or priority of any lien or security interest held by, or the obligations owed to or claim of, the Prepetition Lender or any other party prior to the Petition Date, and the Debtor, Wells Fargo Capital Finance, Inc. and other parties in interest in this case reserve all rights, defenses and claims with respect to the foregoing, and (ii) neither the Debtor nor any other party in interest shall be deemed to have waived any right to challenge the extent, validity or priority of the prepetition liens or claims of the Prepetition Lender or any other party.

29.     The Debtor further requests authority to enter into the DIP Loan Documents with the DIP Lender.

30.     As additional assurance that the DIP Facility will be repaid, the DIP Lender will be granted and allowed a superpriority administrative expense claim in accordance with Section 364(c)(1) of the Bankruptcy Code having priority and right of payment over any and all other obligations, liabilities and indebtedness of the Debtor, now in existence or hereafter incurred by the Debtor, and over any and all administrative expenses or priority claims against the Debtor now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all

administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, provided, however, such claim will not have priority over the Carve-Out.

31.    The Debtor believes that the financing described herein is in its best interest and the best interest of its creditors.  The financing provided herein will allow the Debtor to pay ongoing operating expenses and maintain and improve the value of the Prepetition Collateral which has been pledged to the Prepetition Lender. The Debtor's access to the financing described herein will maximize its ability to continue its business without interruption.

32.    The Debtor is presently unable to obtain, in the ordinary course of business or otherwise:

      (a)    pursuant to Section 364(a) or 364(b) of the Bankruptcy Code, unsecured credit (including, without limitation, unsecured trade credit) allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense;

      (b)    pursuant to Section 364(c)(1) of the Bankruptcy Code, unsecured credit (including, without limitation, unsecured trade credit) with priority over any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code;

      (c)    pursuant to Section 364(c)(2) of the Bankruptcy Code, credit secured by a lien on property of the estate that is not otherwise subject to a lien;

      (d)    pursuant to Section 364(c)(3) of the Bankruptcy Code, credit secured by a junior lien on property of the estate that is subject to a lien; or

      (e)    credit on any basis other than that described in the Term Sheet.

33.    After considering all of the alternatives, the Debtor has concluded, in the exercise of its business judgment, that the financing to be provided under the terms of the Term Sheet and this Motion represents the best financing available to the Debtor and is in the best interests of the Debtor, its creditors and other parties in interest.

34.     It is the Debtor's belief that the Prepetition Lender will consent prior to the initial hearing on this Motion to the granting of a senior lien in favor of the DIP Lender as contemplated by the DIP Facility and the DIP Loan Documents.  In the absence of such consent, the Debtor alleges that the Prepetition Lender will be adequately protected within the meaning of 11 U.S.C. §§ 361 and 363, by virtue of numerous factors, including:

    (a)    the Debtor's assets will continue to serve as collateral for the liens of the Prepetition Lender;

    (b)    a significant portion of the amounts advanced by the DIP Lender will be used to maintain the going concern value of the Debtor and fund the costs of producing more goods and services, which, if successful, will increase the value of the collateral held by the DIP Lender and the Prepetition Lender and result in an "equity cushion";

    (c)    the amounts advanced under the DIP Facility will be in accordance with a budget approved by the DIP Lender and the Prepetition Lender and subject to approval of this Court; and

    (d)    the value of the Debtor's assets in their current state will increase in value by an amount equal to or greater than the proceeds from the DIP Facility.

35.     Good cause has been shown for the entry of an order granting this Motion pursuant to Bankruptcy Rule 4001(c)(2).  In particular, entry of the order is in the best interest of the Debtor and its business and its ability to continue to operate as a going concern.

36.     As set forth in the Motion and based upon the record of this proceeding, the DIP Lender and the Debtor have negotiated the terms and conditions of the DIP Facility in good faith and at arm's-length, and the terms and conditions of the DIP Loan Documents are fair and reasonable and are supported by reasonably equivalent value.  The Debtor requests that this Court find that any credit extended by the DIP Lender pursuant to the terms of the DIP Loan Documents will have been extended in "good faith" (as that term is used in Section 364(e) of the Bankruptcy Code).

## Notice

37.     A copy of this Motion is being sent to the Office of the United States Trustee, counsel to the DIP Lender and the twenty largest unsecured creditors of the Debtor. The Debtor requests that the Court enter an order finding that notice of this Motion and the initial hearing on this Motion is adequate and sufficient and complies with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of this Court.  The Debtor submits that, given the emergency nature of the relief requested herein, no other or further notice need be given.

## Basis for Emergency Relief

38.     The facts previously set out herein clearly justify an immediate hearing on this Motion.  The Debtor requires the DIP Facility described herein in order to fund its business operations and the other costs described hereinabove.

WHEREFORE, the Debtor respectfully requests that this Court enter an order granting this Motion, authorizing the Debtor to obtain financing and grant liens pursuant to 11 U.S.C. §§ 364(c) and (d) in accordance with the terms and conditions of the DIP Loan Documents, authorizing the Debtor's borrowing of funds necessary to avoid immediate and irreparable harm pursuant to the terms of the Interim Order and pending a final hearing pursuant to Bankruptcy Rule 4001, and granting such other and further relief as may be just and proper.

Dated: June 27, 2011

/s/  Charles A. Postler
Charles A. Postler (Fla. Bar No. 455318)
cpostler@srbp.com
STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
110 Madison Street, Suite 200
Tampa, Florida 33602
PH      (813) 229-0144
FAX    (813) 229-1811
Attorneys for Debtor

# EXHIBIT A

[WFCF Letterhead]

June 24, 2011

Teltronics, Inc.
2511 Corporate Way
Palmetto, Florida 34221
Attn: Ewen Cameron, President and Chief Executive Officer

Dear Mr. Cameron:

Wells Fargo Capital Finance, Inc., a California corporation ("WFCF"), is pleased to present this confidential proposal to provide debtor-in-possession financing (the "DIP Facility") to Teltronics, Inc., a Delaware corporation ("Borrower"), for credit in the amount and under the terms and conditions outlined below. **This proposal is not a commitment to lend**, but does represent our sincere interest in providing the financing you require as outlined herein. Initially capitalized terms used but not defined in this letter shall have the meanings ascribed to such terms in that certain Credit Agreement, dated as of May 31, 2007 (as amended to date and together with all other agreements between WFCF and Borrower, the "Prepetition Loan Agreement").

## GENERAL TERMS

| | |
|---|---|
| **DIP Facility:** | A $2,500,000 revolving line of credit with a $550,000 sublimit for advances against inventory. The maximum amount available under the DIP Facility is subject to the Borrowing Base. |
| **Borrower:** | Teltronics, Inc., a Delaware corporation, as a debtor in possession in a case (the "Bankruptcy Case") under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"). |
| **Closing Date:** | The date on which an interim order approving the DIP Facility and the DIP loan documents acceptable to WFCF (the "Interim Order") is entered by the Bankruptcy Court, and fulfillment of all of the other Conditions Precedent and Conditions Subsequent set forth below to the satisfaction of WFCF and its counsel (the "Closing Date"). |
| **Termination Date:** | The commitment of WFCF will terminate and all amounts owing under the DIP Facility will be due and payable, on the earliest to |

1

occur of: (1) September 30, 2011, (2) the effective date of a plan of reorganization in form and substance acceptable to WFCF, (3) the occurrence of an Event of Default (as discussed below) under the definitive DIP Facility loan agreement (the "DIP Loan Agreement") or any of its related documents as requested by WFCF (the "DIP Loan Documents") and a determination by WFCF to terminate its commitment (such date, the "Termination Date"), or (4) the closing of a sale that satisfies the Obligations (as defined below) in full in cash.

**Financial Covenants:**        TBD

**Available Amount:**           Advances under the DIP Facility shall not exceed the lowest of:

1.  $2,500,000, or

2.  The amount calculated under the Borrowing Base, or

3.  An amount (the "Remaining Budgeted Disbursement Amount") equal to: (i) 110% of the amounts of all projected disbursements for each week set forth in the budget attached hereto as Annex A (the "Budget") minus (ii) the aggregate amount of advances actually made under the DIP Facility by Borrower from the Closing Date through such date of determination (prior to giving effect to any requested loan not yet made) on a weekly basis. The Budget shall not be modified or otherwise amended without the consent of WFCF.

**Use of Proceeds:**            Proceeds of all advances under the DIP Facility may be used to fund general corporate and working capital requirements of Borrower (including fees and expenses) and identified as projected disbursements in the Budget.

No portion of the DIP Facility may be used to commence or prosecute any action or objection with respect to obligations (the "Pre-Petition Obligations") owing to WFCF under the Pre-Petition Loan Agreement or the liens on or security interests in favor of WFCF in property of Borrower (the "Pre-Petition Collateral") securing the Pre-Petition Obligations.

**Borrowing Base:**             "Borrowing Base" means, as of any date of determination, the result of:

1.  the lesser of:

(a)  85% of the amount of pre-petition and post-petition Eligible Accounts, less the amount, if any, of the

Dilution Reserve, and

    (b)    an amount equal to Borrower's Collections with respect to Accounts for the immediately preceding [___] day period, plus

2.    the lower of:

    (a)    $550,000, and

    (b)    12% of the value of pre-petition and post-petition Eligible Inventory valued at cost, minus

3.    the sum of (a) the Bank Product Reserve, (b) a reserve in the amount of the claim of certain "carve out" expenses relating to fees and costs incurred by professionals retained by Borrower or other party pursuant to Section 328 of the Bankruptcy Code, not to exceed an aggregate sum of $100,000, and (c) the aggregate amount of any other reserves established by WFCF under the DIP Loan Agreement, minus

4.    the outstanding balance of all Advances under the Pre-Petition Loan Agreement; minus

6.    other standard deductions from the Borrowing Base substantially the same as in the Pre-Petition Loan Agreement.

Eligibility as acceptable collateral on which to advance and the advance rates will be solely determined by WFCF.

**Application of Proceeds:**    The proceeds of all Pre-Petition Collateral shall be applied first to repay outstanding Pre-Petition Obligations until paid in full, and thereafter to repay outstanding obligations under the DIP Facility ("DIP Facility Obligations").

The proceeds of all Post-Petition Collateral (as defined below) shall be applied first to repay outstanding DIP Facility Obligations until paid in full, and thereafter to repay outstanding Pre-Petition Obligations but only to the extent of any diminution in value following commencement of the Bankruptcy Case.

In the event any proceeds cannot conclusively identified by Borrower as Pre-Petition Collateral or Post-Petition Collateral, WFCF shall be entitled to treat such proceeds ass Pre-Petition Collateral.

| | |
|---|---|
| **Prepayment:** | The DIP Facility may be prepaid, in whole or in part, at any time at the option of the Borrower, without penalty or premium. |

**CONDITIONS**

**Conditions Precedent:** Conditions precedent to the closing of the DIP Facility customarily found in WFCF's loan agreements for similar DIP financings and other conditions deemed by WFCF to be appropriate to the specific transaction and in any event including, without limitation:

- The Closing Date must occur no later than July 5, 2011.

- The Bankruptcy Court shall have entered the Interim Order within seven days after the commencement of the Bankruptcy Case consistent with the terms of this proposal letter and such other terms as required by WFCF.

- Entry of findings of fact and conclusions of law in support of the Interim Order, in form and substance acceptable to WFCF.

- Borrower shall retain a chief restructuring officer ("CRO"), whose identity, terms of engagement and scope of duties shall be acceptable to WFCF, and who shall be exclusively responsible for overseeing and managing financial matters of Borrower, including authorizing disbursements, preparing, reviewing and validating financial reporting and borrowing base certificates, and monitoring Borrower's income, expenses, financing and use of cash collateral.

- All documentation relating to the DIP Facility, in form and substance satisfactory to WFCF and its counsel, creating and granting a first priority lien on the Collateral as defined below and outlined herein shall have been executed and delivered.

- All documentation relating to the DIP Facility shall be in form and substance satisfactory to WFCF and its counsel.

- Credit approval by the appropriate WFCF officers.

- All fees and expenses (including, without limitation, reasonable fees and expenses of counsel) required to be paid

to WFCF on or before the Closing Date shall have been paid; provided, however, accrued and unpaid prepetition amendment fees and the Closing Fee (defined herein) shall accrue and be paid on the Termination Date.

- WFCF shall have a valid and perfected first priority lien on and security interest in the Collateral, all filings, recordations and searches (to the extent necessary or desirable by WFCF) in connection with such liens and security interests shall have been effectuated by order of the Bankruptcy Court and/or otherwise; and all filing and recording fees and taxes, if any, shall have been duly paid.

**Condition Subsequent:**

- The Bankruptcy Court shall have entered a final order approving the DIP Facility (the "Final Order"), on terms and conditions acceptable to WFCF in its sole and absolute discretion, within 30 days after the commencement of the Bankruptcy Case.

- Borrower shall engage, not later than 30 days after the Closing Date, an investment banker (the "Investment Banker") to assist Borrower with (i) the refinancing of the Obligations, (ii) a sale of all or a portion of the assets (other than in the ordinary course) of Borrower that will satisfy the Obligations, or (v) a recapitalization of Borrower in an amount that will satisfy the Obligations (each, a "Transaction").

- Not later than 75 days following the Closing Date, the Investment Banker shall have (i) prepared and provided to WFCF an information memorandum about Borrower to be used in connection with soliciting offers for a Transaction, and (ii) provided evidence to WFCF that such memorandum has been distributed to potential lenders, investors and/or purchasers.

**Other Conditions:**

- Borrower shall realize gross revenue not less than the projected revenue, and shall not incur or pay expenses greater than 110% of the amounts of all projected expenses, in the aggregate per line item and for each weekly period (which amounts may be increased upon WFCF's prior written consent), as set forth in the Budget, in form and substance acceptable to WFCF.

- Borrower and its officers, directors and employees shall cooperate and assist the CRO, provide the CRO with access to all information, files and records of Borrower, shall not

interfere with or take any act that would restrict the CRO's performance of his or her duties, and shall not terminate or alter the CRO's engagement to effectuate a termination or discharge of the CRO, unless for cause and with the consent of WFCF.

**COLLATERAL AND PRIORITY/ADEQUATE PROTECTION**

**Collateral:**

All loans and advances under the DIP Facility shall be secured by a security interest in all accounts, chattel paper, documents, deposit accounts, equipment, general intangibles, instruments, intellectual property, inventory, investment property, letter-of-credit rights, real estate, and all other business assets, including without limitation, all Pre-Petition Collateral, excluding, however, all rights, actions and recoveries arising under Chapter 5 of the Bankruptcy Code including avoidance actions (the "Avoiding Power Causes of Action"). All Collateral (other than Pre-Petition Collateral) is herein referred to as "Post-Petition Collateral".

**Secured Priority/Collateral:**

Senior priority pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code, junior only to (i) certain liens and interests of certain senior, PMSI and lessor interests of record as perfected by UCC-1 Financing Statement in existence at the time of commencement of the Bankruptcy Case, and not otherwise avoided, (ii) valid, enforceable and perfected liens that are capitalized leases, purchase money security interests or mechanics' liens in existence at the time of commencement of the Bankruptcy Case as identified and scheduled, (iii) valid and enforceable liens that are capitalized leases, purchase money security interests or mechanics' liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code as identified and scheduled, (iv) the claim of certain "carve out" expenses relating to fees and costs incurred by professionals retained by Borrowers or other party pursuant to Section 328 of the Bankruptcy Code, not to exceed an aggregate sum of $100,000, and (v) the payment of certain fees owed to certain governmental agencies and the Court pursuant to 28 U.S.C. § 1930.

**Cash Dominion:**

All cash to be deposited in a concentration account maintained by WFCF.

**Collateral Account and Lockbox:** All Borrower receipts to be directly deposited to a separate collateral account (via the use of a lockbox) at Wells Fargo Bank. After allowing one (1) day for collection of receipts by the depository institution, deposited amounts will be applied to the DIP Facility Obligations or the Pre-Petition Obligations, as set forth above. For interest calculation purposes, deposited amounts will be applied one (1) business day of receipt by WFCF in its general account, but the amount of principal paid shall continue to accrue interest at the applicable interest rate from the calendar day of receipt by WFCF until one (1) business day after receipt by WFCF. Standard money transfer and/or wire fees will apply. Notwithstanding the forgoing, upon WFCF's prior consent at WFCF's discretion, Borrower may retain and use certain deposits and prepayments by customers paid to Borrower for the purchase of raw materials to the extent that such prepayments are held by Borrower pursuant to an arrangement acceptable to WFCF pursuant to which the prepayment funds will only be released upon WFCF's written consent.

**Unsecured Priority:** Administrative unsecured claim priority pursuant to Sections 364(b) and 364(c)(1) of the Bankruptcy Code, excluding, however, Avoiding Power Causes of Action.

**Adequate Protection/ Replacement Liens:** (i) Payments to WFCF of proceeds of Pre-Petition Collateral consistent with the DIP Facility, and (ii) replacement liens in favor of WFCF, in all Pre-Petition Collateral and Post-Petition Collateral, of the same extent, validity and priority as the liens in the Pre-Petition Collateral in favor of WFCF, to the extent of any diminution in value.

Borrower shall continue to make all required payments due under the Pre-Petition Loan Agreement on all Pre-Petition Obligations, as and when due, including without limitation, all payments of interest due on the Term Loan.

## FEES AND EXPENSES

**Interest Rate:** An amount equal to the Base Rate plus 3.75% per annum floating, payable monthly in arrears calculated on the basis of actual days elapsed in a year of 360 days. Default rate of interest may be up to 2% higher than the rate otherwise payable.

**Minimum Interest:** 6% interest rate floor.

| | |
|---|---|
| **Unused Line Fee:** | A fee of 0.375% per annum on the unused portion of the DIP Facility will be payable monthly on terms substantially the same as in the Pre-Petition Loan Agreement. |
| **Closing Fee:** | $50,000 fully earned upon entry of the Interim Order and payable upon the Termination Date. |
| **Early Termination Fee:** | Waived. |
| **Servicing Fee:** | Same as Pre-Petition Loan Agreement. |
| **Audit, Appraisal, and Valuation Charges:** | Same as Pre-Petition Loan Agreement. |
| **Expenses:** | All out-of-pocket expenses, incurred to provide the DIP Facility, including without limitations: reasonable legal fees and expenses, closing costs, appraisal fees, UCC search and recording fees, costs for individual and corporate credit reports, surveys, and real estate title searches, recording fees, environmental assessment fees, physical inspection fees, fees to initiate electronic reporting and collateral examination costs incurred by WFCF in connection with the transactions contemplated herein, are to be paid by Borrower whether or not the DIP Facility is funded. This obligation will survive the expiration or termination of any approval. |

## OTHER BANKRUPTCY RELATED TERMS

| | |
|---|---|
| **506(c) Surcharge Waiver:** | In the Final Order Borrower shall waive any right to seek a surcharge of WFCF's collateral under Section 506(c) of the Bankruptcy Code upon satisfaction in full of the Obligations. |
| **Prepetition Claim and Lien Objection Limitation:** | No objection to the Pre-Petition Obligations or the liens securing it may be brought after 90 days from the date of selection of counsel for the Creditors' Committee or, if no Creditors' Committee is appointed, 120 days from the commencement of the Bankruptcy Case. |
| **Relief from Stay:** | In the Final Order, WFCF shall be entitled to seek relief from stay upon shortened notice with respect to any act to enforce rights or remedies with respect to the Collateral following default under the DIP Facility. |
| **Reservation of Lender Rights:** | WFCF reserves all rights to object to any act by Borrower or other party, including motions to approve the sale, use or lease of |

assets, applications to retain professionals or to allow or approve payment of professional fees, or to a plan of reorganization.

**Other Waivers:** Borrower irrevocably waives any rights that it may have to seek authority (i) to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code secured by the Collateral other than from WFCF unless such authority results in the obligations outstanding under the DIP Facility and the Pre-Petition Obligations (the "Obligations") being satisfied in full; (ii) to use cash collateral after an event of a default under the DIP Facility, except for purposes of completing a wind down pursuant to a wind down budget and terms acceptable to WFCF; and (iii) such other waivers to be determined by WFCF.

## EVENTS OF DEFAULT

**Event of Default:** Same as Pre-Petition Loan Agreement.

**Events of Default (DIP):**

**Dismissal:** Dismissal of the Bankruptcy Case.

**Appointment of Trustee** Appointment of a chapter 11 trustee or a responsible officer or examiner with enlarged powers.

**Third Party Relief from Stay:** Entry of an order granting of relief from automatic stay to permit exercise of rights on behalf of any party with respect to a significant asset or assets.

**Other Priority Claims/Liens:** Entry of an order granting, or filing by Borrower of a motion seeking the granting of any priority claim that is senior or *pari passu* with the priority of claims of WFCF.

**DIP Financing Order Modification:** Entry of an order amending, supplementing, modifying, reversing, or vacating of, or filing by Borrower of a motion seeking the amendment, supplement, modification, reversing, or vacating of any DIP Facility order.

**Cessation of Liens or Priority Claim:** Cessation of liens or super-priority claims granted with respect to the DIP Facility to be valid, perfected and enforceable in all respects.

| | |
|---|---|
| **Termination of CRO:** | The termination or discharge of the CRO, and he or she is not promptly replaced with a new CRO reasonably acceptable to WFCF. |
| **Other Bankruptcy Defaults:** | Such other bankruptcy events as determined by WFCF. |

## MISCELLANEOUS TERMS

| | |
|---|---|
| **Personal Guarantees:** | Waived. |
| **Subordinated Debt:** | Same as Pre-Petition Loan Agreement. |
| **Cash Management:** | Consistent with prepetition cash management practices between Borrower and WFCF. |
| **Financial Reporting:** | Same as Pre-Petition Loan Agreement. |
| **Loan Documentation:** | Substantially the same as the Pre-Petition Loan Agreement, except with such modifications to conform to the terms described in this proposal letter, all in form and content acceptable to WFCF and its counsel. |
| **Governing Law:** | New York |
| **Jurisdiction:** | The Bankruptcy Court |

*[remainder of this page intentionally left blank]*

If you are in agreement with the foregoing please sign and return the original of this letter. This proposal is confidential between you and WFCF. This proposal will expire if not accepted prior to June 27, 2011.

**WELLS FARGO CAPITAL FINANCE, INC.,**
a California corporation,

By: _____

Name: _____ JOHN T. LEONARD

Title: _____ MANAGING DIRECTOR

S-1
DIP Facility Proposal

AGREED AND ACCEPTED TO ON THIS __
DAY OF JUNE, 2011

**TELTRONICS, INC.,**
a Delaware corporation

By: _____

Name: _____

Title: _____

## Annex A

Budget

[See Attached]

| Category | 1-Jul | 8-Jul | 15-Jul | 22-Jul | 29-Jul | 5-Aug | 12-Aug | 19-Aug | 26-Aug | 2-Sep | 9-Sep | 16-Sep | 23-Sep | 30-Sep | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | |
| Revenue | 461,647 | 103,128 | 96,469 | 95,518 | 683,756 | 872,639 | 182,298 | 229,298 | 613,808 | 629,005 | 295,080 | 248,718 | 155,125 | 819,007 | 5,485,495 |
| | | | | | | | | | | | | | | | 5,485,495 Check |
| DIP Loan Advances | | | | | | | | | | | | | | | |
| Pre-Petition-Employee related | - | - | - | - | - | - | - | - | - | - | - | - | - | 222,427 | 222,427 |
| Payroll | 342,000 | - | 342,000 | - | 360,000 | - | 342,000 | - | 360,000 | - | 342,000 | - | 360,000 | - | 2,448,000 |
| Insurance Related | 190,322 | | | 33,000 | 100,000 | | | 33,000 | 100,000 | | | 5,000 | 28,000 | 100,000 | 589,322 |
| Real Estate and Other Leases | - | - | - | - | - | 102,500 | - | - | - | - | 102,500 | - | - | - | 205,001 |
| Utilities and Telephone | 15,000 | - | - | 5,000 | 5,000 | 45,000 | 5,000 | 5,000 | 5,000 | 45,000 | 5,000 | 5,000 | 5,000 | 5,000 | 150,000 |
| Contractors Suppliers and Freight | 322,897 | 50,000 | 25,000 | 25,000 | 73,000 | 150,000 | 75,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 1,420,897 |
| Professionals | - | - | - | - | - | 130,000 | - | 25,000 | - | 25,000 | - | 38,000 | - | 25,000 | 243,000 |
| Other | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 70,000 |
| DIP Loan Advances | 875,219 | 55,000 | 372,000 | 68,000 | 543,000 | 432,500 | 427,000 | 168,000 | 570,000 | 175,000 | 554,500 | 153,000 | 498,000 | 457,427 | 5,348,646 |
| | | | | | | | | | | | | | | | 5,348,646 Check |
| Revolver Balance | 2,309,752 | 1,338,500 | 1,041,173 | 1,086,073 | 1,550,002 | 1,929,791 | 2,283,717 | 2,178,858 | 2,135,132 | 2,079,270 | 2,235,151 | 2,274,475 | 2,041,289 | 2,102,146 | 2,102,146 |

# SCHEDULE 1

TELTRONICS, INC.
20 Largest Unsecured


Active Sales Assoc, Inc.
7411 114th Ave. North St 313
Largo, FL 33773-5127

Anixter, Inc.
P. O. Box 847428
Dallas, TX 75284-7428

Arrow Electronics
P O Box 951597
Dallas, TX 75395-1597


Avnet Emg
P O Box 847722
Dallas, TX 75284-7722

Cbiz Kirkland, Russ, Murphy & Tapp
13577 Feather Sound Dr, #400
Clearwater, FL 33762

Datacomm Consulting Group
1276 Castleton Ave
Staten Island, NY 10301-1718


Delco Electrical Corp.
766 5th Avenue
Brooklyn, NY 11232-1619

Epstein Becker & Green, P.C.
250 Park Ave
New York, NY 10177-1211

Expertel Communications, Ltd.
19915 23rd Avenue
Whitestone, NY 11357-4123


GHT Co. Ltd.
16 Nanyunyi Lu
Guangzhou Science City
**China   00051-0663**

GM Data Communications Inc.
48 Woodbine Court
Floral Park, NY 11001-2718

Gulfcoast Property No. 1, LLC
Attn: Hugh Miller, Member
1200 1st Ave. W., #200
Bradenton, FL 34205


Innovative Circuits Inc.
1095 Windward Ridge Pkwy
Suite 110
Alpharetta, GA 30005-1728

Manatee County Tax Collector
P.O. Box 25300
Bradenton, FL 34206

Network
Po Box 905419
Charlotte, NC 28290-5419


New York City Dept. of Finance
345 Adams St.
Brooklyn, NY 11201

Powell Electronics Inc
200 Commodore Drive
Logan Township, NJ 08085-1270

Sat Utility Contracting LLC
7318 69 Place
Glendale, NY 11385


Starcom Comm Services, Inc.
41 Central Drive
Farmingdale, NY 11735

Weather Wise Conditioning Corp
333 Stagg Street
Brooklyn, NY 11206-1701